In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 14-1124

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

PAUL DAVIS, JR., *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CR 63 — **John W. Darrah**, *Judge.*

_____

ARGUED JUNE 3, 2015 — DECIDED JULY 13, 2015

_____

Before WOOD, *Chief Judge*, and BAUER, POSNER, FLAUM, EASTERBROOK, KANNE, ROVNER, WILLIAMS, SYKES, and HAMILTON, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* The United States has appealed from a district court's order dismissing an indictment, but without prejudice to a new indictment (should one be returned within the statute of limitations). The district judge took this step to permit appellate review of his discovery order, with which the prosecutor had declined to com-

ply. Once the indictment had been dismissed, the Solicitor General authorized an appeal under the Criminal Appeals Act, 18 U.S.C. §3731. But a panel of this court dismissed the appeal for lack of jurisdiction, 766 F.3d 722 (7th Cir. 2014), ruling that the Act authorizes appeal only if the dismissal of an indictment would be final within the meaning of 28 U.S.C. §1291. The possibility of reindictment and recurrence of the discovery dispute made this dismissal non-final, the panel held. We granted the United States' petition for rehearing en banc.

# I

The indictment charges Paul Davis and six confederates—Alfred Withers, Julius Morris, Jayvon Byrd, Vernon Smith, Corey Barbee, and Dante Jeffries—with several federal offenses arising from a plan to rob a stash house, where the defendants believed they would find drugs and money. We need not set out the plan's details or the precise statutes involved, because proceedings on the merits of the charges never got under way in the district court. What matters now is that the stash house the defendants thought they would rob did not exist. They were caught in a sting.

According to the prosecutor, Davis repeatedly approached someone he thought to be a potential partner in crime and asked whether he knew of any opportunities to conduct robberies. Davis did not know that his interlocutor was cooperating with the FBI. Acting on the informant's reports, agents bought drugs from Davis three times; this gave some credibility to the informant's report that Davis was interested in robbing stash houses to get drugs to sell. The FBI passed the information to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), which sent an undercover

agent to conduct a sting. Posing as a disgruntled drug couri-
er, the agent told Davis about an opportunity to rob a stash
house, supposedly containing 50 kilograms of cocaine. Davis
recruited assistants (the other six defendants). They dis-
cussed the possibility of killing the stash houses' guards and
the undercover agent too in order to eliminate witnesses and
avoid sharing the loot. When arrested at the assembly point
for the planned robbery, three of the seven defendants car-
ried firearms.

They maintain that the prosecutor, the FBI, and the ATF
engaged in racial discrimination, in violation of the Due Pro-
cess Clause's equal-protection component. The defendants
told the district court that since 2006 the United States At-
torney for the Northern District of Illinois has prosecuted 20
stash-house stings, and that of the defendants in these cases
75 were black and 19 white. According to defendants, 13 of
the 19 white defendants were Hispanic. All seven defend-
ants in this prosecution are black. Defendants asserted that
these figures "present a picture of stark discriminatory prac-
tices by the ATF and FBI who target, through the use of in-
formants and undercover agents, select persons to present
with the opportunity to commit a hypothetical … lucrative
crime."

Defendants asked the judge to direct the prosecutor to
provide extensive information about who is prosecuted, how
they (and others) were selected for attention by the FBI and
ATF, and how the United States Attorney's office makes de-
cisions after receiving reports from investigators. The prose-
cutor opposed this motion, contending that *United States v.
Armstrong*, 517 U.S. 456 (1996), forbids discovery into prose-
cutorial selectivity unless the defense first shows that simi-

larly situated persons have not been prosecuted. The defense's data about who had been prosecuted did not include any information about who could have been prosecuted, but was not.

The district court entered a discovery order substantially as the defense had proposed it, writing in a short explanation that "the prosecution in this District has brought at least twenty purported phony stash house cases, with the overwhelming majority of the defendants named being individuals of color. In light of this information, it is necessary to permit Defendants discovery on the following issues … ." The district court did not identify any similarly situated person who had not been prosecuted or explain why *Armstrong* allows a court to compel disclosures by the prosecutor in the absence of that information.

Coupled with the breadth of the discovery order (which we discuss in Part III of this opinion), this led the United States to decline to comply. The Criminal Appeals Act does not authorize appeals from discovery orders, but it does authorize appeals from orders dismissing indictments. The district judge agreed to facilitate appellate review by dismissing the indictment without prejudice, and the United States appealed. That brings us to the jurisdictional question.

## II

If this were a civil case, and a complaint had been dismissed without prejudice in an attempt to permit immediate review of a discovery order, an appeal would not be possible. See, e.g., *Doctor's Associates, Inc. v. Duree*, 375 F.3d 618 (7th Cir. 2004) (dismissing an appeal where the parties reserved the right to reactivate the litigation later); *Furnace v.*

*Board of Trustees*, 218 F.3d 666 (7th Cir. 2000) (same). For 28 U.S.C. §1291, which governs most civil appeals, requires a "final decision," and to be final the dismissal of a complaint generally must be with prejudice. Some statutes, such as 28 U.S.C. §1292, authorize interlocutory appeals; so do some rules, such as Fed. R. Civ. P. 23(f); but in the main a final decision is essential—and the Supreme Court insists that the exceptions to the final-decision rule be applied sparingly, to avoid dragging litigation out. See, e.g., *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009). The Justices have said that this is likewise true for appeals by defendants in pending criminal cases, which also are covered by §1291. See, e.g., *Flanagan v. United States*, 465 U.S. 259 (1984). Compare *Abney v. United States*, 431 U.S. 651 (1977), with *United States v. MacDonald*, 435 U.S. 850 (1978).

But the United States relies on the Criminal Appeals Act, 18 U.S.C. §3731, which applies exclusively to the prosecutor's appeals in criminal cases. This statute provides:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, or any part thereof, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

> An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

> An appeal by the United States shall lie to a court of appeals from a decision or order, entered by a district court of the United States, granting the release of a person charged with or convicted of an offense, or denying a motion for revocation of, or modification of the conditions of, a decision or order granting release.
>
> The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.
>
> The provisions of this section shall be liberally construed to effectuate its purposes.

Defendants maintain, and the panel held, that the first clause of §3731's first paragraph, referring to "a decision, judgment, or order of a district court dismissing an indictment", covers only the sort of dismissal that would be "final" for the purpose of an appeal under §1291.

The rest of §3731 provides context for evaluating this position—as does a comparison with §1291, which permits appeals from "final" decisions. The word "final" does not appear in §3731, nor does any similar word.

Context begins with the first paragraph of §3731, which after mentioning an indictment or information adds "or granting a new trial after verdict or judgment, as to any one or more counts, or any part thereof". An order setting a case for a new trial is not a final decision. Nor is an order setting one count for a new trial, or a "part" of one count for a new trial. And if we read the "count" language as modifying both indictments and new trials—so that we get "dismissing an indictment or information … as to any one or more counts"—again §3731 ¶1 authorizes appeals from non-final decisions, for in ordinary civil litigation a decision dismissing one count of a complaint cannot be appealed unless the requirements of Fed. R. Civ. P. 54(b) are met.

Paragraph 2 of §3731 authorizes appeals from orders suppressing or excluding evidence, or ordering the return of property (though the rest of the case continues). Orders excluding evidence and disposing of some property while the litigation continues are not final decisions under §1291.

The third paragraph continues the pattern by authorizing an appeal from an order granting a person's release on bail (while the case proceeds), or denying a motion to modify conditions of release, or to revoke release on bail. None of these orders is a final decision that ends the litigation and leaves nothing but execution of the judgment, the standard definition of "final" under §1291. See, e.g., *Gelboim v. Bank of America Corp.*, 135 S. Ct. 897, 902 (2015); *Catlin v. United States*, 324 U.S. 229, 233 (1945).

It seems apt to say that all of §3731 is an exception to the final decision rule. And so the Supreme Court has described it. In the course of distinguishing appeals under §1291 from those under §3731, the Court called §3731 "a statutory exception to the final judgment rule". *Flanagan*, 465 U.S. at 265 n.3. If finality were essential then, when responding to the holding of *United States v. Sanges*, 144 U.S. 310 (1892), that the United States needs express authority to appeal, Congress could have amended §1291 so that a prosecutor, like other litigants, may use it plus interlocutory appeals by permission under §1292(b). (Defendant and prosecutor alike also could use 18 U.S.C. §3742, which authorizes appeals of sentences in criminal cases.) Instead Congress created a separate Criminal Appeals Act and has amended it over the years to include the many categories of non-final orders that we have mentioned. *United States v. Wilson*, 420 U.S. 332, 336–39 (1973), traces this history.

Defendants want us to hold that the first clause of §3731 ¶1 *alone* has an atextual finality requirement, which not only would divorce orders dismissing indictments from every other kind of order under §3731 but also would create the anomaly that a dismissal of one count would be immediately appealable (though non-final in civil practice) while the dismissal of all counts would not be appealable. Neither the text nor the structure of §3731 permits such an approach.

Section 3731 authorizes interlocutory appeals in part because the Double Jeopardy Clause of the Fifth Amendment creates special obstacles for a prosecutor who contends that a district court's order is erroneous. The Supreme Court stressed in decisions such as *Mohawk Industries* that, if a district court errs, an appeal from the final decision usually allows the mistake to be corrected, if necessary by holding a new trial. But errors in favor of the defense in a criminal prosecution may lead to acquittal, and the prosecution cannot appeal from a mid-trial acquittal by the judge, or an end-of-trial acquittal by the jury, no matter how erroneous the ruling that led to this outcome—even though in parallel civil litigation the losing litigant would have a full appellate remedy. See, e.g., *Fong Foo v. United States*, 369 U.S. 141 (1962); *Sanabria v. United States*, 437 U.S. 54 (1978). That's why §3731 departs from §1291 and why it is inappropriate to read into §3731 a "finality" requirement that it lacks (but §1291 contains).

Congress has not taken the final-decision rule as far as it might go. The books are full of exceptions thought helpful to facilitate accurate or prompt decision. We have mentioned §1292, which permits appeals from orders granting, denying, or modifying injunctions (interlocutory or final) plus orders

certified by district judges and accepted by courts of appeals. Another statute, 28 U.S.C. §1453(c), permits immediate appellate review of orders remanding suits that had been removed on the authority of the Class Action Fairness Act. And §1447(d) permits appeals of remands in civil-rights cases or those removed by federal officers. Rule 23(f) permits appeals from orders certifying or declining to certify class actions. Section 3731 is just another in the complement of exceptions to §1291's final decision rule.

Even if we were disposed to fight against the language of §3731 (which lacks the word "final"), and its structure, and its objective of accommodating the prosecution's need to obtain appellate review in a way consistent with the Double Jeopardy Clause, we would still respect the Supreme Court's description of §3731 as "remov[ing] all statutory barriers to Government appeals". *Wilson*, 420 U.S. at 337. Ditto, *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568, 577 (1977). Perhaps this is an overstatement; after all, §3731 contains a list of appealable orders, which does not include discovery orders. That's why the prosecutor asked the district court to choose a remedy on the statutory list. But the minimum meaning of the statement in *Wilson* is that *if* the district court enters a listed order, there are no *further* barriers to appeal. A final-decision rule imported from §1291 would be such a further barrier.

Because discovery orders are not on the §3731 list, appellate review depended on the district court's cooperation. The judge chose a response that was listed; if the judge had decided to exclude vital evidence as a sanction for the prosecutor's stance, that too would have authorized an appeal. It is hard to see why this appeal should be foreclosed because the

judge chose what seemed to be the cleanest way to proceed. But if in the future a district judge believes than an interlocutory appeal would be unduly disruptive, the court has only to avoid issuing one of the sorts of orders that fall within the scope of §3731. The prosecutor cannot dismiss an indictment on his own but requires the court's approval. Fed. R. Crim. P. 48(a). (The prosecutor may of course decline to proceed with a case, whether or not a judge dismisses the indictment, but a prosecutor can't appeal from his own decision.) If the judge chooses a response not on the §3731 list, then to obtain review the prosecutor would need to meet the stringent requirements of a writ of mandamus, a discretionary remedy limited to the clearest errors and usurpations of power.

Although, as we have mentioned, *Wilson* may be thought to slight the fact that §3731 contains a specific list of appealable orders, the Justices themselves seem willing to take the language of *Wilson* and *Flanagan* at face value.

*United States v. Bass*, 536 U.S. 862 (2002), offers an illustration. In the wake of *Armstrong*, which held that discovery relating to a claim of selective prosecution depends on proof that eligible persons of a different race have not been prosecuted, a defendant contended that the Attorney General took race into account when deciding when to authorize a prosecutor to seek capital punishment. The defense offered the same sort of evidence that had been deemed inadequate in *Armstrong*: that black defendants were charged with capital crimes out of proportion to the general population. The district court ordered discovery into the exercise of prosecutorial discretion and, when the United States declined to provide the information, dismissed the prosecutor's notice of intent to seek the death penalty. The United States appealed,

the court of appeals affirmed, and the Supreme Court summarily reversed, holding the discovery order incompatible with *Armstrong*. Yet the district court's order dismissing the notice of intent to seek the death penalty not only was interlocutory (the criminal prosecution remained pending) but also is not on the list in §3731. Still, the court of appeals and the Supreme Court did not see a jurisdictional problem. We recognize that an opinion disregarding an issue, even a jurisdictional one, does not establish a holding. See, e.g., *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 91–92 (1998). But the Court may have let the issue pass precisely because it sees no need to retreat from the statements made about §3731 in *Flanagan*, *Wilson*, and *Martin Linen*.

Other courts of appeals take the Justices at their word. Several have entertained appeals from orders dismissing indictments without prejudice. See, e.g., *United States v. Lester*, 992 F.2d 174, 176 (8th Cir. 1993), and *United States v. Woodruff*, 50 F.3d 673, 675 (9th Cir. 1995). As far as we know, no court of appeals has added a finality requirement to §3731 ¶1 and thus forbidden the appeal from an order dismissing an indictment without prejudice—or for that matter required "finality" for the appeal of *any* order covered by §3731.

Defendants insist that *United States v. Clay*, 481 F.2d 133 (7th Cir. 1973) (Stevens, J.), commits this court to a different path. Yet in *Clay* the court held that §3731 *allows* an appeal from an order dismissing an indictment without prejudice. Along the way, *Clay* remarked that, despite the district court's choice of label, the order was "final" in the sense that the dispute would not recur. Defendants read that as a holding that if a dispute can recur—as this discovery dispute could recur if another grand jury returned another indict-

ment—then an appeal is forbidden. This reads too much in-
to *Clay*. Saying "if conclusive, then appealable" (as *Clay* did)
differs from saying "*only* if conclusive, then appealable."
*Clay* did not have a non-final order and could not announce
a holding about that subject—nor did it purport to do so.

But suppose this is wrong and *Clay* did think that finality
is essential. Since then, the Supreme Court has said repeat-
edly that barriers (other than the Double Jeopardy Clause)
not stated in §3731 itself do not foreclose appeals. Section
3731 does not contain a final-decision rule. The language in
*Clay*, though not its holding, has been overtaken by devel-
opments in the Supreme Court, and this court, sitting en
banc in 2015, is not bound by what one panel believed about
§3731 in 1973.

We hold that §3731 authorizes an appeal when a district
court dismisses an indictment, or a count of an indictment,
or a part of a count of an indictment, without prejudice to
the possibility of a successive indictment containing the
same charge. The court therefore has jurisdiction to decide
whether the indictment was properly dismissed, which de-
pends on whether the discovery order was itself proper.
(*Armstrong* reached the Supreme Court in the same way, as
the United States used the dismissal of an indictment to pre-
sent a question about the propriety of a discovery order.)

## III

Before entering the discovery order, the district court
said only that "the prosecution in this District has brought at
least twenty purported phony stash house cases, with the
overwhelming majority of the defendants named being in-
dividuals of color. In light of this information, it is necessary

to permit Defendants discovery" about prosecutorial practices and criteria. That decision is inconsistent with *Armstrong*. The record in *Armstrong* showed that *every* defendant in *every* crack-cocaine prosecution filed by a particular United States Attorney's office and assigned to the public defender was black. If, as the Supreme Court held, that evidence did not justify discovery into the way the prosecutor selected cases, then proof that in the Northern District of Illinois three-quarters of the defendants in stash-house cases have been black does not suffice.

The United States believes that we should stop here and reverse. But things are not that simple. *Armstrong* was about prosecutorial discretion. The defendants assumed that state and federal law-enforcement agents arrested all those they found dealing in crack cocaine, and they suspected that the federal prosecutor was charging the black suspects while letting the white suspects go. The Supreme Court replied that federal prosecutors deserve a strong presumption of honest and constitutional behavior, which cannot be overcome simply by a racial disproportion in the outcome, for disparate impact differs from discriminatory intent. See *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979). The Justices also noted that there are good reasons why the Judicial Branch should not attempt to supervise how the Executive Branch exercises prosecutorial discretion. In order to give a measure of protection (and confidentiality) to the Executive Branch's deliberative processes, which are covered by strong privileges, see *Cheney v. United States District Court*, 542 U.S. 367 (2004); *In re United States*, 503 F.3d 638 (7th Cir. 2007); *In re United States*, 398 F.3d 615 (7th Cir. 2005); *United States v. Zingsheim*, 384 F.3d 867 (7th Cir. 2004), the Court in *Armstrong* insisted that the defendant produce

evidence that persons of a different race, but otherwise comparable in criminal behavior, were presented to the United States Attorney for prosecution, but that prosecution was declined. *Bass* held the same about the selection of capital prosecutions, and for the same reasons.

To the extent that Davis and the other six defendants want information about how the United States Attorney has exercised prosecutorial discretion, *Armstrong* is an insuperable obstacle (at least on this record). But the defendants' principal targets are the ATF and the FBI. They maintain that these agencies offer lucrative-seeming opportunities to black and Hispanic suspects, yet not to those similarly situated in criminal background and interests but of other ethnicity. If the agencies do that, they have violated the Constitution—and the fact that the United States Attorney may have prosecuted every case the agencies presented, or chosen 25% of them in a race-blind lottery, would not matter, since the constitutional problem would have preceded the prosecutor's role and could not be eliminated by the fact that things didn't get worse at a later step. Cf. *Connecticut v. Teal*, 457 U.S. 440 (1982) (rejecting a "bottom-line defense" in an employment-discrimination suit).

Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel. They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. Statements that agents make in affidavits for search or arrest warrants may be contested, and the court may need their

testimony to decide whether if shorn of untruthful statements the affidavits would have established probable cause. See *Franks v. Delaware*, 438 U.S. 154 (1978). Agents may be personally liable for withholding evidence from prosecutors and thus causing violations of the constitutional requirement that defendants have access to material, exculpatory evidence. See, e.g., *Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). Before holding hearings (or civil trials) district judges regularly, and properly, allow discovery into nonprivileged aspects of what agents have said or done. In sum, the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution.

How does the district court's order hold up by these standards? Here is its full text, which requires the United States to produce:

(1) A list by case name and number of each phony stash house rip off case brought by the U.S. Attorney's Office for the Northern District of Illinois in which ATF alone or in conjunction with the FBI was the federal investigatory agency from 2006 to the present. With respect to each case, the Government shall provide the race of each defendant investigated and prosecuted.

(2) For each case identified in response to (1) above, a statement regarding prior criminal contact that the federal agency responsible for the investigation had with each defendant prior to initiating the operation. If all such information for a particular case is contained in the criminal complaint, a reference to the complaint is sufficient.

(3) The statutory or regulatory authority for the ATF and the FBI to instigate and/or pursue phony staff [sic] house ripoff cases in-

volving illegal drugs or any decision by any federal agency, the Justice Department or the White House to authorize ATF and the FBI to pursue such cases in the Northern District of Illinois.

(4) All national and Chicago Field Office ATF and FBI manuals, circulars, field notes, correspondence or any other material which discuss phony stash house ripoffs, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made and how to ensure that agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

(5) All documents that contain information on how supervisors and managers of the Chicago area ATF and FBI were to ensure and/or did ensure or check that its agents did not target persons on the basis of their race, color, ancestry, or national origin for the phony stash house ripoffs and what actions the Chicago area ATF and FBI supervisors and managers operating in the Northern District of Illinois took to determine whether agents were not targeting persons for such operations on the basis of their race, color, ancestry, or national origin.

(6) The factual basis for the decision to pursue or initiate an investigation against each of the individuals listed as defendants in each case cited in Paragraph 7 of Defendants' Motion for Discovery and in response to each case produced pursuant to the request contained in Paragraph (1) above.

(7) All documents containing instructions given during the tenure of Patrick Fitzgerald or Gary Shapiro as the U.S. Attorney for the Northern District of Illinois about the responsibilities of prosecutors to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois are not targeted due to their race, color, ancestry, or national origin. Specifically, materials that demonstrate that the individuals charged as defendants in phony stash house cases in which ATF alone or in conjunction with the FBI was the investigatory agency have not been targeted due to their race, color, ancestry,

or national origin, and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry, or national origin.

(8) All documents that contain information about all actions taken during the tenure of Patrick Fitzgerald or Gary Shapiro as the U.S. Attorney for the Northern District of Illinois about the responsibilities of prosecutors to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois have not been targeted due to their race, color, ancestry, or national origin and, specifically, that those persons who are defendants in phony stash house cases in which ATF alone or in conjunction with the FBI was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry, or national origin.

This order is vastly overbroad. A good deal of the discovery it requires is blocked by *Armstrong* (on the current record) because it concerns the exercise of prosecutorial discretion. Other discovery is blocked by executive privilege independent of *Armstrong*; a district court is not entitled to require "the White House" (which is to say, the President) to reveal confidential orders given to criminal investigators. But some of the discovery asks for information from supervisors or case agents of the FBI and ATF, and this is outside the scope of *Armstrong*, the executive privilege, and the deliberative-process privilege.

To say that some of the information is potentially discoverable is not to vindicate any part of this particular order, however. Consider ¶5, which requires the United States to produce "all documents" that contain any "information" about how the FBI and ATF manage stings (pejoratively called "phony stash house ripoffs"), plus all details concerning how these agencies curtail discrimination. This demands

the disclosure of thousands (if not millions) of documents generated by hundreds (if not thousands) of law-enforcement personnel. It would bog down this case (and perhaps the agencies) for years.

Or consider ¶4, which requires the public disclosure of all criteria the agencies employ to decide when and how to conduct sting operations. Agencies understandably want to keep such information out of the hands of persons who could use it to reduce the chance that their own criminal conduct will come to light. For the same reason that the IRS does not want to reveal its audit criteria, the FBI and ATF do not want to reveal their investigative criteria. Perhaps the FBI and ATF might be able to improve the public's understanding and acceptance of their selection criteria by releasing more information, but that's not a legal obligation.

Similar things could be said about other paragraphs, but the point has been made. This order is an abuse of discretion.

The racial disproportion in stash-house prosecutions remains troubling, however, and it is a legitimate reason for discovery provided that the district court does not transgress *Armstrong* or an applicable privilege.

Instead of starting with a blunderbuss order, a district court should proceed in measured steps. Logically the first question is whether there is any reason to believe that race played a role in the investigation of these seven defendants. The prosecutor says that it cannot have done, because Davis himself initiated matters by pestering the informant for robbery opportunities and then chose his own comrades. Still, it remains possible that the FBI and the ATF would not have

pursued this investigation had Davis been white. Defend-ants contend that they have additional evidence (beyond that presented to the district court) that could support such a conclusion. The judge should receive this evidence and then decide whether to make limited inquiries, perhaps including affidavits or testimony of the case agents, to determine whether forbidden selectivity occurred or plausibly could have occurred. If not, there would not be a basis to attribute this prosecution to the defendants' race, and the district court could turn to the substance of the charges.

If the initial inquiry gives the judge reason to think that suspects of another race, and otherwise similarly situated, would not have been offered the opportunity for a stash-house robbery, it might be appropriate to require the FBI and ATF to disclose, in confidence, their criteria for stash-house stings. Analysis of the targeting criteria (and whether agents followed those rules in practice) could shed light on whether an initial suspicion of race discrimination in this case is justified. Keeping that part of the investigation *in camera* would respect the legitimate interest of law enforce-ment in preventing suspects (and potential suspects) from learning how to avoid being investigated or prosecuted. If after that inquiry the judge continues to think that racial dis-crimination may have led to this prosecution, more infor-mation could be gathered.

We do not want to tie the judge's hands, but we do think it essential, lest this and other prosecutions be sidetracked (both defendants and the public have a right to speedy reso-lution of criminal cases), to start with limited inquiries that can be conducted in a few weeks, and to enlarge the probe only if evidence discovered in the initial phase justifies a

wider discovery program. Only if information learned during these limited inquiries satisfies the *Armstrong* criteria may discovery be extended to the prosecutor's office, and even then the judge should ensure that required disclosures make no more inroads on prosecutorial discretion than are vital to ensuring vindication of the defendants' constitutional right to be free of race discrimination.

The judgment dismissing the indictment is reversed, and the case is remanded for proceedings consistent with this opinion.

ROVNER, *Circuit Judge*, with whom HAMILTON, *Circuit Judge*, joins, dissenting.

In a case charging the defendants with conspiring to rob a fictitious stash house, it is perhaps fitting that our appellate jurisdiction is premised on a fictitious sanction—a dismissal of the indictment that was proposed by the government, and granted by the district court, for the express and sole purpose of facilitating an appeal of a discovery order that the government opposed. The dismissal was non-binding, to boot, allowing the government to proceed with the prosecution regardless of what we might have to say about the merits of the discovery order. However far Congress may have meant to extend the limits of appellate jurisdiction when it re-wrote the Criminal Appeals Act in 1970, I am confident that this appeal lies beyond those bounds. For all of the prudential reasons that we do not permit civil litigants to manufacture appellate jurisdiction, we should not allow an appeal based on the sort of non-final dismissal that was fabricated here. I must therefore respectfully and regretfully part ways with my colleagues on the matter of our jurisdiction to hear this appeal.

Although the government is nominally appealing the order dismissing the indictment—an order that 18 U.S.C. § 3731 identifies as an appealable order—the government is not actually aggrieved by that dismissal. The government invited the district court to dismiss the indictment solely as a gateway to appellate review of another, interlocutory order—the discovery order—as to which section 3731 does not otherwise permit an appeal. *See* R. 129 (government's position paper regarding appeal of selective prosecution discovery order). The district court, in turn, acceded to the government's declared intent to challenge the discovery order in this court and dismissed the indictment without prejudice in order to

facilitate the appeal. The record leaves no doubt that this was the one and only reason for the dismissal:

> AUSA: Your Honor, … [w]e would suggest to the Court that in light of our non-compliance with the Court's discovery order, we're willing to suggest—or, pardon me, to accept dismissal of the indictment as a sanction permitting the government to appeal.
>
> THE COURT: So if I don't dismiss it, you can never appeal my ruling, is that the idea?
>
> AUSA: I suppose that's correct, your Honor.
>
> THE COURT: That's a very attractive proposal.
>
> That's a very interesting issue, and I think it is an issue that the Seventh Circuit should take a close look at, and I'm sure they will.
>
> And so the indictment is dismissed. …

R. 144 at 4; *see also* R. 144 at 6 (court confirms, at government's request, that the dismissal is without prejudice).

As my colleagues in the majority recognize, this would not be tolerated in the civil context. *Ante* at 4-5. Indeed, we have repeatedly disapproved efforts by civil litigants to engineer

appellate jurisdiction by inviting the district court to enter a dismissal order that has the veneer of appealability when, in fact, the dismissal is a sham intended to serve solely as the vehicle for what is otherwise an unauthorized interlocutory appeal. *See Sims v. EGA Prods., Inc.*, 475 F.3d 865, 867-78 (7th Cir. 2007); *ITOFCA, Inc. v. Mega Trans Logistics, Inc.*, 235 F.3d 360, 363-64 (7th Cir. 2000); *West v. Macht*, 197 F.3d 1185, 1188-90 (7th Cir. 1999); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 776-77 (7th Cir. 1999); *Horwitz v. Alloy Auto. Co.*, 957 F.2d 1431, 1435-36, 1437 (7th Cir. 1992); *see also Union Oil Co. of Cal. v. John Brown E&C, a Div. of John Brown, Inc.*, 121 F.3d 305, 308-11 (7th Cir. 1997). A civil plaintiff, for example, may be frustrated with an order that disposes of some counts of his complaint but not others, *JTC Petroleum*, 190 F.3d at 776-77, or which prospectively limits his damages, *Union Oil*, 121 F.3d at 306, 307. Rather than awaiting a final judgment or seeking the court's leave to pursue an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the plaintiff instead asks the court to dismiss what remains of his complaint without prejudice, thereby terminating the litigation in the district court and producing a seemingly final order that would permit him to challenge on appeal any and all of the interlocutory orders preceding that order. *See Sims*, 475 F.3d at 867-68. Except that the judgment is not final, because it permits the plaintiff to re-file the counts it has persuaded the court to dismiss without prejudice, even if he loses the appeal. *E.g., West*, 197 F.3d at 1188; *JTC Petroleum*, 190 F.3d at 776; *see also Union Oil*, 121 F.3d at 307-08 (parties entered into settlement terminating litigation, contingent upon outcome of appeal). As such, the manufac-

tured dismissal cannot serve as the gateway to review of what the plaintiff is really appealing—an interlocutory order.[1]

The importance of finality has been central to our decisions in these cases. *See ITOFCA*, 235 F.3d at 363-64 & n.1; *West*, 197 F.3d at 1188-89; *Union Oil*, 121 F.3d at 310-11; *Horwitz*, 957 F.2d at 1435-36, 1437. "Finality as a condition of review is an historic characteristic of federal appellate procedure." *Flanagan v. United States*, 465 U.S. 259, 263, 104 S. Ct. 1051, 1053-54 (1984) (quoting *Cobbledick v. United States*, 309 U.S. 323, 324, 60 S. Ct. 540, 541 (1940)). Except where Congress has specifically authorized an interlocutory appeal, *see* 28 U.S.C. § 1292(b), or where the order appealed from falls into the narrow category of collateral orders that are immediately appealable, *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S. Ct. 1221, 1225 (1949), we generally insist that there be a truly final judgment before a disappointed party may appeal the otherwise interlocutory order that has aggrieved him. The requirement of finality serves a number of important prudential concerns:

> It helps preserve the respect due trial judges by minimizing appellate-court interference with the numerous decisions they must make in the pre-judgment stages of litigation. It reduces the ability of litigants to harass opponents and to clog the courts through a succession of costly and time-consuming appeals. It is crucial to the efficient administration of justice. *Firestone Tire & Rubber Co. v. Risjord, supra*, 449 U.S. [368], at 374,

---

[1]  *Cf. JTC Petroleum*, 190 F.3d at 776-77 (finding appellate jurisdiction only after plaintiff agreed to treat dismissal of remaining counts as having been granted with prejudice).

> 101 S. Ct. [669], at 673 [(1981)]. For these reasons,
> "[t]his Court has long held that the policy of
> Congress embodied in [section 1291] is inimical
> to piecemeal appellate review of trial court
> decisions which do not terminate the litigation.
> … *United States v. Hollywood Motor Car Co.*,
> 458 U.S. 263, 265, 102 S. Ct. 3081, 3083 (1982).

*Flanagan*, 465 U.S. at 263-64, 104 S. Ct. at 1054. *See also ITOFCA*, 235 F.3d at 363-64 & n.1; *West*, 197 F.3d at 1189; *Union Oil*, 121 F.3d at 310. The rationale underlying the final judgment rule is "especially compelling in the administration of criminal justice." *Flanagan*, 465 U.S. at 264, 104 S. Ct. at 1054 (quoting *Cobbledick*, 309 U.S. at 325, 60 S. Ct. at 541); given that "the defendant is entitled to speedy resolution of the charges against him," *Will v. United States*, 389 U.S. 90, 96, 88 S. Ct. 269, 274 (1967) (*citing DiBella v. United States*, 369 U.S. 121, 126, 82 S. Ct. 654, 658 (1962)).

What the government has done in this case to produce an appealable order is precisely what we have deemed forbidden in the civil context. It has engineered a dismissal as the means of obtaining review of an otherwise interlocutory and unappealable discovery order. But the dismissal was not final, as it would have been if the district court had dismissed the indictment due to incurable pleading defect, or as a sanction for pretrial delay or some other fault that the government could not cure. *See, e.g.*, *United States v. Clay*, 481 F.2d 133, 136 (7th Cir. 1973) (indictment dismissed based on post-arrest delay in indicting defendant). Nominally, the dismissal was entered as a sanction for the government's announcement that it did not intend to comply with the court's discovery order, but only nominally. The dismissal was invited by the government as a means to appeal, and was granted by the district

court in deference to that wish; there was never an independent assessment by the district court as to whether dismissal of the indictment was an appropriate sanction on the facts of the case. (If the court had truly intended the dismissal as a sanction, it would have dismissed the indictment with prejudice, as I discuss below.) But because the dismissal was without prejudice, the government retained the ability to re-indict the defendants regardless of what we held in this appeal. As it has turned out, the government has succeeded in its challenge to the discovery order; the dismissal of the indictment is thus being reversed, *ante* at 20, and on remand, the prosecution will pick up where it left off. But even if we had affirmed the discovery order (and hence the dismissal of the indictment), the government would have been free to return to the grand jury, obtain a second indictment on the same charges, and then comply with the discovery order if and when the court issued it in the new prosecution. Heads the government wins, tails the defendants lose.[2]

It is worthwhile to consider the multiple ways in which allowing an appeal based on the government's invited dismissal of the indictment without prejudice is contrary to the interests served by the finality requirement and grants to the government what amounts to an advisory opinion on the merits of its opposition to the district court's discovery order.

---

[2]    *See ITOFCA*, 235 F.3d at 364 (noting that dismissal of counterclaims without prejudice permitted defendant to re-file them at any time, and regardless of what transpired on appeal); *West*, 197 F.3d at 1188 ("The practical effect of the dismissal [of claims on which plaintiff was granted *in forma pauperis* status] is that, if this maneuver is permitted, West may immediately appeal the district court's order insofar as it denied IFP status, and, if he loses the appeal, he may refile the claims on which he was granted IFP status.").

Such consideration also demonstrates why conditioning this type of appeal on a final judgment—in other words, a dismissal of the indictment with prejudice—would accommodate the government's interests and at the same time protect the equally important interests of the defendants, the district court, and this court.

First and foremost, by permitting the government to invite dismissal of the indictment, we have allowed it to cut short the proceedings in the district court, and we cannot be sure that those proceedings necessarily would have resulted in dismissal of the indictment had they been permitted to run their course. Recall that the government suggested the dismissal as a "sanction" for its refusal to comply with the discovery order. R. 129 at 1-2 ¶¶ 4, 7; R. 144 at 4. But there was never any meaningful inquiry below into whether dismissal of the indictment actually was the appropriate sanction for the government's unwillingness to comply with the ordered discovery; the dismissal was asked for and granted solely in order to open the door to this appeal. R. 144 at 4. Had the government instead come into court and said, "Judge, we are unwilling to comply with your discovery order," period, the court necessarily would have had to commence an inquiry into an appropriate response.

And it is by no means certain that the government's opposition to the order necessarily would have led the court to dismiss the indictment. The government's wholesale refusal to comply with a court order is, safe to say, a rare occurrence. I cannot recall it ever happening in my courtroom in my eight years as a district judge. My first response to such a declaration, and I suspect the response of many, if not most judges, would be to explore why the government believed it could not comply with my order—not because I felt bullied by the

government's resistance, but because the rarity of a refusal like this (by a party that shares the court's obligation to ensure a fair and just proceeding) merits thoughtful reconsideration. I might have asked whether there was something the government believed I had overlooked in entering the order; and given the opportunity to revisit the order, particularly if I were pointed to the differing results reached by other district judges, I might have reached a different conclusion. (Judge Darrah was among the first of his colleagues in the Northern District of Illinois to issue an order granting a defense request for discovery related to the question of selective prosecution in the stash house cases. By the time the government asked him to dismiss this case more than two months later, other judges had ordered much narrower discovery and had otherwise refused to authorize the broad discovery that he had ordered. *See* R. 143 at 6-7. Yet, the government did not ask Judge Darrah to reconsider his order in light of those rulings.) I might also have asked the government whether there was any portion of the order, or any aspect of the discovery sought by the defendants, that it would willingly comply with—we are told, after all, that the government has complied with the more modest discovery orders entered in other stash house cases; and I might have asked the parties to start with the agreed upon discovery and see what that produced before deciding whether and how to sanction the government for its opposition to the balance of my order. In short, I might have sought a middle ground between the parties—perhaps something not too different from the incremental approach to discovery that the majority has outlined today—that would have circumvented the impasse and permitted the case to move forward without the interruption that this appeal has occasioned. *Cf. In re Blodgett*, 502 U.S. 236, 240, 112 S. Ct. 674, 676-77 (1992) (faulting government for

not asking court of appeals to vacate or modify its order indefinitely staying prisoner's execution before seeking writ of mandamus from Supreme Court).

Even if the government had persisted in its refusal to comply with some or all aspects of my discovery order, I cannot say that I inevitably would have dismissed the indictment, the weightiest of the penalties available to me. *See Barnhill v. United States*, 11 F.3d 1360, 1367-69 (7th Cir. 1993) (variously describing entry of judgment, including dismissal with prejudice, as a "draconian," "severe," "harsh," "powerful," "serious," and "extreme" sanction for party's misconduct). Before taking that course, it would have been my obligation to consider not only the egregiousness of the government's non-compliance but the burden it inflicted on the defendants and the public's interest in seeing that those who have broken the law are brought to justice. *See id.* It is entirely possible that I might have chosen a different sanction, and one that might or might not have been immediately appealable, if it was appealable at all. *See, e.g., United States v. Moussaoui*, 382 F.3d 453, 459-60 (4th Cir. 2004) (after inviting briefing as to appropriate sanction for government's refusal to comply with order granting defendant access to enemy combatant witnesses, district court rejected parties' shared proposal to dismiss indictment, and instead dismissed death notice and foreclosed certain lines of evidence and argument to government).

Finally, assuming that I did decide to dismiss the indictment as a sanction, I surely would have done so with prejudice. Why, after all, would I leave the option of re-indictment open to the government if I believed that its refusal to comply with my order were serious enough to warrant dismissal of the case? Its sole effect would be to force the government to

present its case to a grand jury for a second time, while changing nothing about the nature of the case, the relevance of the discovery I had ordered, or the reasons for the government's opposition to the discovery order. The second indictment would in all likelihood end up in my courtroom (*see* N.D. ILL. LOCAL RULE 40.3(b)(2) and N.D. ILL. LOCAL CRIM. RULE 1.2), and the parties and I would be back where we started. In short, dismissal without prejudice would resolve nothing. By contrast, dismissal of the indictment with prejudice would resolve the impasse, and that dismissal *would* be a genuinely final order that would permit the government to appeal.

Just as we cannot be sure that the district court inevitably would have dismissed the indictment, we cannot be sure that the government would have persisted in its blanket refusal to comply with any part of the court's discovery order had it been subject to a genuine sanctions inquiry by the district court. When the government suggested dismissal of the indictment without prejudice to the district judge, it was proposing a "sanction" that had a great deal of upside and very little downside for the government. It opened the door to an immediate appeal of the discovery order, and even if the appeal failed and we affirmed the order, all that the government had to do is re-indict the defendants in order to resurrect the prosecution. And that is a modest burden. Among other things, the government runs the show, its burden of proof is relatively low, and, especially in a sting, most of the evidence is in its hands. A grand jury's refusal to indict is, needless to say, itself a rare occurrence. The ham sandwich aphorism[3] is

---

[3]   Thirty years ago, Solomon Wachtler, then Chief Judge of the New York Court of Appeals, famously remarked that prosecutors could convince a grand jury to "indict a ham sandwich" if that is what they wanted. *See*

not too far from the truth. *See Tyson v. Trigg*, 50 F.3d 436, 441 (7th Cir. 1995) ("Instances in which grand juries refuse to return indictments at the behest of the prosecutor are almost as rare as hen's teeth."). By contrast, had the district court instead taken it upon itself to decide what sanction was appropriate for the government's refusal to comply with its discovery order, including potentially a contempt finding or dismissal of the indictment *with* prejudice, one wonders whether the government might have modified its position and agreed to supply at least some discovery to the defendants. It is one thing to submit oneself to a sanction of one's own design (and that serves one's own ends) and very much another thing to defy the district court and face uncertain, and potentially grave, consequences.

All of this shows why the dismissal in this case was a complete fiction as a sanction, and why we are potentially misallocating our time to an appeal that might have been obviated by further proceedings in the district court. In short, we have permitted the government and the district court to do exactly what we have forbidden in the civil context: collaborate to produce a sham judgment for the purpose of facilitating review of an otherwise unappealable, interlocutory order, when the finality typically required for such an appeal is entirely absent. *See Horwitz v. Alloy Auto. Co.*, *supra*, 957 F.2d at 1435-36, 1437. And this is precisely why our opinion is advisory: we are presuming, without knowing, that the discovery order would have remained as broad as it is had the district judge been invited to reconsider the order rather than collaborating to manufacture appellate jurisdiction; we are presuming, without

---

Marcia Kramer & Frank Lombardi, *New top state judge: Abolish grand juries & let us decide*, N.Y. DAILY NEWS, Jan. 31, 1985, at 3.

knowing, that the government would have persisted in refusing to comply with the discovery order had the choice of sanction been left up to the district judge; and we are presuming, without knowing, that the judge would have selected dismissal of the indictment as its sanction after a genuine inquiry.

Apart from authorizing an appeal that might be unnecessary, the court's jurisdictional determination is inconsistent in several other ways with the concerns animating the finality requirement.

First, in accepting an appeal based on the invited and non-final dismissal of the indictment, we are potentially interfering with the district court's management of the case by permitting the government to appeal a discretionary, pretrial discovery order that Congress has not identified as one of the interlocutory orders that may be appealed. *See Flanagan*, 465 U.S. at 263-64, 104 S. Ct. at 1054; *ITOFCA*, 235 F.3d at 364 n.1. Of course, Judge Darrah cannot be heard to complain on that point, given that he willingly entered the dismissal order that paved the way for this appeal. But he is only one of multiple judges in the Northern District of Illinois presiding over similar stash house prosecutions in which the defendants are pursuing claims of selective prosecution; and all of them will now be bound by the discovery framework this court has outlined. There is much to be said for the clarity that this court has brought to that issue. If I agreed that we had jurisdiction over this appeal, I might well be joining the court's opinion. But the danger in an appellate court reaching an issue prematurely or unnecessarily is that we might make a decision without the illumination that further development in the lower court would have given us, and in doing so hobble the district courts and ourselves with a rule that will not stand the test of time. That, by the way, is one

advantage of mandamus, which permits us to intervene when truly necessary but restricts our role to policing the very outermost boundaries of the district court's authority, and reserves ample discretion to the trial judges to manage their cases as they see fit. Not incidentally, by accepting this appeal, we are circumventing the limits that mandamus would otherwise impose on disruptive appeals of this type. *See Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380, 124 S. Ct. 2576, 2586 (2004) ("[Mandamus] is a 'drastic and extraordinary' remedy 'reserved for really extraordinary cases.'") (quoting *Ex Parte Fahey*, 332 U.S. 258, 259-60, 67 S. Ct. 1558, 1559 (1947)).

Second, we are placing significant burdens on the defendants by allowing the government to interrupt the litigation in order to pursue the appeal of a non-dispositive order. *See Flanagan*, 465 U.S. at 264, 104 S. Ct. at 1054; *ITOFCA*, 235 F.3d at 364 n.1. Nominally, the indictment has been dismissed, but because the dismissal was without prejudice, the prosecution of the defendants likely would have resumed regardless of whether we affirmed or reversed the challenged discovery order. In the meantime, while the advancement toward trial has ceased, the defendants have remained under the cloud of unresolved charges.[4] The fact that they have had to post bond

---

[4]   I recognize that none of the defendants objected to the dismissal of the indictment, *see* R. 144 at 6-7, but then of course they might have anticipated, particularly in light of *United States v. Clay*, *supra*, 481 F.2d at 135-36, that we would not permit the appeal of a non-final dismissal of the indictment without prejudice. That, indeed, has been their position throughout the course of this appeal.

in order to secure their release while this appeal is pending is merely one illustration of that fact.[5]

Third, we have burdened the time and resources of first three and now ten judges of this court in order to resolve an issue that later events in the district court might have rendered moot, had we not permitted the government to engineer the dismissal of the indictment. *See Union Oil*, 121 F.3d at 309 ("[L]ike the parties, we too must be concerned with our resources."). In short, this appeal has all of the hallmarks of piecemeal appellate litigation that the Supreme Court has cautioned against. *Flanagan*, 465 U.S. at 263-64, 104 S. Ct. at 1053-54; *see also ITOFCA*, 235 F.3d at 364 n.1; *West*, 197 F.3d at 1189; *Union Oil*, 121 F.3d at 310.

My colleagues nonetheless hold that finality is not required when the government is appealing the dismissal of the indictment, reasoning that because each of the other orders that section 3731 authorizes the government to appeal (orders suppressing evidence, for example) is a non-final order, Congress must have intended to permit the appeal of any order dismissing an indictment, whether final or not. *Ante* at 8-9. The final judgment rule embodied in section 1291 thus can have no application to government appeals under section 3731, *ante* at 8-9, which is an interpretation that even the government has not urged upon us.

The argument is somewhat ahistorical, in that Congress originally permitted appeals *only* from certain orders dismiss-

---

[5]   For purposes of pretrial release, when the government takes an appeal pursuant to section 3731, 18 U.S.C. § 3143(c) requires the district court to treat the defendant as if the case were still active and apply the criteria set forth in 18 U.S.C. § 3142.

ing an indictment (including dismissals based on defects in the statute underlying an indictment) or otherwise disposing of a case (including an order sustaining a plea in bar), and those orders were indisputably final. 34 Stat. 1246; *see United States v. Wilson*, 420 U.S. 332, 336-37, 95 S. Ct. 1013, 1018-19 (1975) (discussing the original and successor versions of the Criminal Appeals Act). With the 1970 amendments to the Criminal Appeals Act, Congress surely did expand the range of dismissals that were appealable, but it is not obvious that it meant to expand that range so far as to include non-final dismissals, simply because it added other categories of interlocutory orders to the list of decisions that the government can appeal.

More to the point, what this reasoning misses, in my view, is the singular way in which finality concerns come into play when the order deemed appealable by section 3731 is being used as a gateway to review of another interlocutory order that section 3731 does *not* recognize as appealable. For all of the reasons that I have discussed, requiring that such a dismissal be genuine, *i.e.* final, ensures that appellate review of the order underlying the dismissal (here, the discovery order) is consistent with the longstanding prudential concerns underlying the finality rule. In other words, we would have a genuine sanction based on the government's genuine refusal to comply with the underlying order as to which review is sought. That is precisely the scenario that Congress had in mind when it enacted the 1970 amendments to the Criminal Appeals Act. Although the Act had been modified subsequent to its enactment, the statute in 1970 still authorized appeal from only a limited subset of orders dismissing indictments. *See Wilson*, 420 U.S. at 336-37, 95 S. Ct. at 1018-19; S. Rep. No. 91-1296, at 2, 5-6 (1970) (Report of Senate Judiciary Committee). While Congress was considering modifications to the statute, the Department of

Justice pointed out that the statute as it had been interpreted did not permit the government to appeal dismissals based on grounds other than defects in the indictment or in the statute on which the indictment is based. *Id.* at 22 (Dep't of Justice Comments on S. 3132). Thus, for example, the government had no ability to appeal when the district court had dismissed the indictment as a sanction for the government's refusal to comply with a discovery order that it believed was unauthorized. "In view of the tendency of the courts to expand discovery rights, even beyond those recognized in the Federal Rules of Criminal Procedure, and a growing tendency by courts to dismiss indictments on such grounds, the Government will inevitably be severely handicapped by its inability to appeal such dismissals." *Id.* Congress, in turn, broadened the language of section 3731 specifically to accommodate that concern. *Id.* at 5 (Report of Senate Judiciary Committee). But nowhere in the legislative history is there any hint that Congress thought that discovery orders generally should be appealable and that the government should be free to invite a dismissal of the indictment without prejudice whenever it wished to seek interlocutory review of such orders. That would have represented a dramatic expansion of the government's appeal rights in and of itself, and an equally dramatic departure from finality principles; and yet nowhere in the history is there any recognition of the competing interests implicated by such a significant step nor any other hint that Congress understood the breadth of the appeal rights it would be granting to the government. There is every reason to think that what Congress meant to authorize when it broadened the relevant language of section 3731 was an appeal from a dismissal entered as a true sanction—that is, a dismissal that was considered, final, and thus dispositive of the case. Permitting an appeal in that

instance would address the concern that the government had raised with Congress, while honoring the concerns underlying the finality rule and not granting the government a broad right to appeal discovery orders.

*Wilson*'s extravagant language—that Congress, when it enacted the current Criminal Appeals Act, "intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit," 420 U.S. at 337, 95 S. Ct. at 1019—provides only tepid support for the notion that the final judgment rule embodied in section 1291 has no application to government appeals in criminal cases. We have previously cautioned that *Wilson*'s sweeping declaration cannot be taken literally. *See United States v. Spilotro*, 884 F.2d 1003, 1005-06 (7th Cir. 1989); *United States v. Horak*, 833 F.2d 1235, 1246-47 (7th Cir. 1987). *Wilson* dealt with a double jeopardy issue and had nothing whatever to say on the subject of invited dismissals and the final judgment rule. Given the prominent role that the latter rule has long played in criminal as well as civil appeals, *see Flanagan*, 465 U.S. at 264-65, 104 S. Ct. at 1054-55, I would have expected a clearer signal from Congress that it was jettisoning the finality rule and granting the government a license no other party enjoys—the ability to invite a dismissal and use that as the gateway to appeal an interlocutory order that is otherwise not appealable, all the while reserving the right to proceed with the case even if it loses the appeal.

Likewise, *Flanagan*'s observation that section 3731 is "a statutory exception to the final judgment rule," 465 U.S. at 265 n.3, 104 S. Ct. at 1055 n.3, quoted *ante* at 7, was actually addressed to the statute's specific and separate provision permitting appeals from orders suppressing or excluding evidence. The Court was not referring to the entire statute, or

to the provision authorizing appeals from an order dismissing an indictment in particular.

Certainly it is true that the Double Jeopardy Clause imposes significant constraints on the government's ability to take an appeal, *ante* at 8; *see Wilson*, 420 U.S. at 352, 95 S. Ct. at 1026, but requiring that a dismissal of an indictment be final before it may be appealed would in no way jeopardize the government's ability to exercise its appellate rights. If the district court decided, after an independent inquiry, that dismissal of the indictment was the appropriate sanction for the government's refusal to comply with the court's discovery order—in which case, as discussed, the court would undoubtedly dismiss the indictment *with* prejudice—then the government would have a truly final order to appeal. Likewise, if the government were so certain of its position that it was willing to invite the dismissal of the indictment with prejudice, it could take that course (presuming the district court were amenable), eliminate the need for a sanctions inquiry, and still have a final order of dismissal to appeal. Its willingness to accept such a disposition would be confirmation that the challenged discovery order is, from its point of view, dispositive of the case. Finally, to the extent the government believes that a discovery order is truly beyond the bounds of reason, it always has the option of seeking a writ of mandamus. *See, e.g., Spilotro*, 884 F.2d at 1006-1007. In any of these three scenarios, we would have either a genuinely final judgment to review or a claim that the discovery order was so beyond the district court's authority to impose as to warrant interlocutory intervention.

My colleagues do recognize one meaningful limitation on the government's power to take an immediate appeal of an order with which it does not wish to comply by inviting a dismissal of the indictment without prejudice: the district

court's discretion to decline the invitation. *Ante* at 9-10. The government conceded at argument that the district court has this power, and rightly so. In the face of the government's unwillingness to comply with the court's order, a judge surely is not bound to accept a sanction of the government's choosing.

But our recognition that the district court has the discretion to accept or reject an invitation to dismiss the indictment, and thus to open or close the door to an appeal of an order that is otherwise not appealable under the terms of section 3731, more than anything else makes clear that we have created a right of appeal that Congress itself has not authorized. What we are saying, in effect, is that if the government wishes to take an appeal of an interlocutory order (like a discovery order), it may do so if it is willing to accept a temporary dismissal of the indictment *and* the district court, in the exercise of its discretion, is willing to go along and dismiss the indictment without prejudice in order to make the appeal possible. In everything but name, this is the criminal equivalent of the discretionary, interlocutory appeal that 28 U.S.C. § 1292(b) authorizes in civil cases. Whatever the merits of such an appeal might be, suffice it to say that Congress has not authorized it. *See*, *e.g.*, *United States v. White*, 743 F.2d 488, 493 (7th Cir. 1984). (If Congress had authorized it, we no doubt would have been given the same discretion we possess in the civil context not to permit the appeal. Ironically, that is the one point that distinguishes this type of interlocutory appeal from one taken under section 1292(b): so long as the district court in the exercise of its discretion allows the appeal by dismissing the indictment, we have no choice *but* to accept the appeal.)

The finding of jurisdiction in this case is also inconsistent with the spirit, if not the letter, of our prior decision in *United States v. Clay*, *supra*, 481 F.2d at 135-36 (Stevens, J.). The district

court in that case had dismissed the indictment based on the government's eight-month delay in indicting the defendant after he was arrested. On the government's appeal of that ruling, this court explained that although the district court's order was properly understood as a dismissal without prejudice, "[o]ur construction of the order does not foreclose appealability." *Id.* at 135. Preindictment delay was not a flaw that the government could fix by seeking another indictment from the grand jury: the damage had already been done, and consequently a second indictment would meet the same fate as the first. *Id.* at 136. The dismissal was, in other words, final and therefore appealable. *Id.*

My colleagues pooh-pooh the notion that *Clay* demands finality, *ante* at 11-12, but I have a hard time reading *Clay* otherwise. It is true that the dismissal order in that case was final, and so, strictly speaking, the court did not have to consider whether a non-final order of dismissal would have been appealable. But the significance of finality to the court's finding of appellate jurisdiction is hard to miss. Why else would the court have gone out of its way to observe that, although the court's dismissal of the indictment was properly construed as having been without prejudice, "[that] construction … does not foreclose appealability," *id.* at 135, and then devote several paragraphs to explaining why the order was appealable precisely because it was final, *id.* at 135-36? Under *Clay*'s straightforward reasoning, the dismissal of the indictment in this case simply is not final and appealable.

The Supreme Court's decisions in *United States v. Armstrong*, 517 U.S. 456, 116 S. Ct. 1480 (1996), and *United States v. Bass*, 536 U.S. 862, 122 S. Ct. 2389 ( 2002) (per curiam), by contrast, are utterly silent on the subject of appellate jurisdiction. Certainly it is safe to say that jurisdiction in both cases

was assumed, *see ante* at 10-11, but we are obliged to honor the Court's express directive not to read jurisdictional holdings into precedents that do not address jurisdiction. *See Lewis v. Casey*, 518 U.S. 343, 352 n.2, 116 S. Ct. 2174, 2180 n.2 (1996) (collecting cases).

Moreover, there are reasons to think that the dismissal orders at issue in both *Bass* and *Armstrong* were, in contrast to the order at issue here, final. In *Bass*, the district court had dismissed the government's notice of intent to seek the death penalty as a sanction for the government's refusal to comply with the district court's discovery order. The Sixth Circuit treated the dismissal of the death notice as a partial dismissal of the indictment, which of course section 3731 expressly recognizes as an appealable order. *United States v. Bass*, 266 F.3d 532, 535-36 (6th Cir. 2001) ; *see also United States v. Moussaoui*, *supra*, 382 F.3d at 463 (likewise treating dismissal of death notice as an appealable order and collecting cases). And because the dismissal of the death notice was a genuine sanction that the government could not avoid or undo except by obtaining reversal of the discovery order, the Sixth Circuit expressly labeled the dismissal "a *final*, appealable order under 18 U.S.C. § 3731." 266 F.3d at 535 (emphasis mine). As for *Armstrong*, the Ninth Circuit's opinion, although it did not expressly engage in a discussion of finality in the same sense we are discussing it here (the court instead was addressing the fact that dismissal of the indictment had been stayed pending appeal), had the following to say on the matter of its jurisdiction:

> [T]he appeal is properly before us only because the government knowingly accepted the consequence of opting for an immediate appeal rather than complying with the discovery order. That

> consequence is that, if we affirm, the dismissal of the indictments must now be implemented unless the order dismissing them is further stayed pending review by the Supreme Court. It is too late for the government to change its mind and comply with the discovery order. Were that not the rule, we would simply be permitting appeals of discovery orders under the guise of dismissal orders that were either only tentative or were never intended to take effect. In either case, we would not have jurisdiction over the appeals under § 3731.

48 F.3d 1508, 1510 (9th Cir. 1995) (en banc). This discussion reads very much as if the Ninth Circuit did not believe the option was open to the government, as it was here, to re-indict the defendants and belatedly comply with the district court's order in the event the government lost the appeal. Perhaps that reads too much into the court's language. But so long as we are talking about why the Supreme Court "may have let the issue [of jurisdiction] pass" in silence, *ante* at 11, it is worth pointing out that the Court in *Armstrong* may have thought the dismissal order was a genuinely final order.

For these and all of the other reasons set forth in the panel's opinion, 766 F.3d 722, I respectfully dissent from the court's holding that we have jurisdiction over the government's appeal in this case.